LLC. Our next case for today is 2023-20567. Is it MIECO LLC or MIECO LLC v. Targa Gas Marketing LLC? You may proceed. May it please the Court, there are two parts to this appeal. The first concerns gas that Targa did not deliver to MIECO during Winter Storm Yuri in 2021. That's our appeal. The second issue concerns the price that Targa charged for what gas it did deliver during that same period. That's the cross appeal. I'd like to begin, if I could, with our appeal, the issue of non-delivery, because this Court's opinion in Pioneer makes clear that the grant of summary judgment must be overturned. Targa Gas Marketing, it's important to recognize, is what the Court in Pioneer called a middleman. It does not produce any gas, it does not have any wells, it does not have any gathering lines, it does not have any production facilities. It buys gas and it sells gas. It's the same thing that MIECO does. Now, as much as Targa tries to characterize itself as merely the marketing arm of another entity, that's just a total misnomer. It has two contracts, or three contracts, with various joint ventures that are in part owned by another Targa entity, but a distinct Targa entity, and it buys the output of those production facilities. But even then, over the course of a year, as we pointed out, between 25 and 39 percent of the gas that it sells is purchased from totally unaffiliated third parties, and it demarked the location at issue in this case. It buys much more gas from third parties, excuse me, up to 63 percent in a non-force majeure, non-winter event. So it is a purchaser of gas, it is clearly a middleman. So the Court in Pioneer, in that case, said, well, if you are, first of all, a producer and not a middleman, then your gas supply is deemed to be what you produce from your wells and your pipes. Said it would be very different if it were a middleman, and did not express an opinion on that. Well, here, Targa buys gas and it just suddenly decided, because the price went up, that it would stop doing what it always done. It just wasn't going to buy anymore. It was just going to declare force majeure to everyone and push the price increase on everyone else who had to cover with their own gas. And as the Court in Pioneer, in footnote 22, put it, the question is, is the cause winter storm URI, or is the cause an economically driven decision not to purchase gas? That's clearly a fact issue, and that's what the Pioneer Court said. There's a second and related issue, and let me back up. So you're saying that the District Court was incorrect in determining that it was a force majeure issue? Correct. The District Court. In the partial summary judgment? That's correct, Your Honor, and the District Court was following the lower court opinion in Pioneer before it was partially reversed. Okay. Do we have proper jurisdiction? Is that wrapped up into the final judgment, that determination? It doesn't specifically discuss it in the final judgment that I'm, you know, the Court, because we granted partial summary judgment. Normally, we wouldn't have jurisdiction to review a partial summary judgment unless something was done to split it off or, you know, help me on the jurisdiction. Sure. Jurisdiction does exist, because what the Court essentially said is that Mieko could not pursue its claims for damages and zeroed Mieko out. It zeroed out that, and that's clear from the final judgment, and that's dependent on the partial summary judgment ruling. Correct, because what the Court did was, moving on from that issue, it then held a trial on the second issue, which is the pricing issue, which I'll get to in just a moment, but there are three aspects in which the District Court erred in granting summary judgment on the force majeure issue. Force majeure is section 11 of the Naseby-based contract, which is the contract that all gas companies employ, and it was employed here, and it was employed in Pioneer. 11.1 says that you cannot be relieved of your obligations under a contract on the basis of force majeure if force majeure was not the cause of your inability to perform. Clearly here, the cause of the inability to perform was the decision economically driven not to purchase gas, and that's what footnote 22 says. That is, at a minimum, a fact decision. Does the Pioneer contract also have the economic hardship is not a basis for force majeure as the contract here does? It does, Your Honor. It wasn't discussed in the opinion, I think, by the Court. What should we make of that? Well, I think in Pioneer, the Court had two separate issues. It said in the first place that the District Court in that case was correct in that near impossibility of performing was not required, but then said, but there is a question of could you perform, and so it didn't get into the question of the economic hardship. The second thing that the Court did in Pioneer was it said, well, there's a provision in 11.3 5 that says you cannot declare force majeure if you can't perform because of a failure of your gas supply unless the failure of the gas supply was the result of one of the enumerated force majeure metrics in 11.2, which includes a winter storm. The problem is in that case, the Court said, well, there, Pioneer is a producer. It owns the wells. It owns the pipes, and so this is its gas supply, and its gas supply was affected by the winter storm because the pipes froze and the lines froze, and it said it's different, though, if we're talking about a middleman, and we are talking about a middleman here. It's different. It said we're not deciding that if you're talking about the Pioneer opinion. It's different. I don't quibble over where the Court said it's different. It's a different set of facts, but they may not be a different outcome. What do you say to the allegation here, assertion here based by evidence, is one question I have, that perhaps 70 percent of the gas being sold comes from the seller's affiliates, and part of the force majeure clause says we can declare force majeure in part based on our affiliates declaring force majeure, and if that's 70 percent of the gas, you can give me better what the numbers are, 50 to 70 percent or whatever else. It seems to me that Pioneer might at least apply to that level, to that category of gas, as opposed to force majeure not applying at all. Well, Your Honor, respectfully, I think it doesn't. Pioneer is talking about a case in which you're a producer. I mean, here they are talking about an affiliate, but it's an entirely different entity, and it's in the contract. Well, no, yeah, yeah, you're absolutely right. It says that that's the case, but what does Pioneer do as a matter of course when those plants do not produce? It goes out on the market and purchases gas, and its people admitted that. They, you know, there are various times when the plants are down for various reasons, whether it's maintenance, whether it's something else, and in that case they go and they fill the shortfall on the market. Here they just said we're going to punt, and so there's a very real question as to is it, you know, is the problem that the plant didn't produce at full capacity, or is the issue that they just decided they weren't going to go into the market and fill the gap as they always had? That's their standard practice, and they just didn't do it this time. They took a wholly different course. So Targa then wants to argue that cause doesn't mean cause, and clearly that can't be the case. I mean, this court in footnote 22 in the Pioneer opinion talks about, you know, that the cause is either the winter storm or the cause is a failure to purchase gas. If cause just means this amorphous causal nexus thing that Targa wants to talk about, that would be a nonsensical position. Cause in this case, and in a nationwide contract, means it is the proximate cause. I'd also direct the court for another court's view on that in Arkansas-Oklahoma gas versus BP energy, the 2023 decision for the Western District of Arkansas, which looked at this exact same provision and said, you know, winter storm URI may have been an effect or may have been a precipitating factor, but the proximate cause was a failure of BP energy in that case to secure transportation. And so it made clear that cause means what we would commonly understand to mean cause, and it's not what Targa says. It's something other than cause. So if I could turn now to the Rule 50 motion. The court is very familiar with the difficult standard that Targa faces trying to overturn the court's judgment on this, so I won't belabor that point, but I will point out that the only evidence having to do with a course of usage in the industry came from Mieko. Mieko had both its expert and its chief trader testify that it was a well-known course of usage in the industry that when parties have two or more contracts in effect at the same time, one of them is either a fixed price or a first-of-the-month price contract known as a baseload contract, and another one, also a firm contract, but is a so-called swing contract in that the price varies daily. That if there is a shortfall, the gas is allocated always first of the first of the month or fixed price contract because those are matched against fixed delivery contracts, and only once those are satisfied is the remaining gas allocated to a gas daily or a variable swing contract. What was the response, or was there someone from Mieko? There was no effective rebuttal, and it's interesting. So your client didn't say, no, that's not correct, that's not how it works, or we didn't know that because we're middlemen and we're not really sophisticated, or that's not the way it works where we're from, or something. Is there no action? I'm sorry, Your Honor. This is the cross-appeal. So in this case, we presented the evidence of the industry standard. The industry standards. Yeah, and they didn't do anything? No. So what they did is, and they cite in their brief the following, they say, well, they rebutted it. Well, they didn't. Here's what they did. But they didn't rebut it. They didn't, because we established that it was a well-known industry standard. In fact, the best evidence came from Corey Rowan, our chief trader, who said that he had come across this situation between 24 and 30 times with 24 to 30 other parties, and in none of those cases had there ever been a question about the first of the month first rule. No one ever raised it. Everybody acknowledged it until Target came along. Our expert testified to that. Mr. Rowan and our expert, Mr. Eisenhower, explained why that would have to be the case to match the contracts that were in place with utilities, in other words, on a first of the month basis. Furthermore, Target's own witnesses said in their ICE chats that they recognized the difference between the first of the month and the gas daily contracts. And in fact, they agreed they weren't even going to nominate for delivery gas under the gas daily contract, so that any gas that was delivered would necessarily be under the first of the month contract. Now, Target tries to get out from under that and say, oh, we rebutted it, and so therefore we get a different instruction or whatever. Here's what their so-called rebuttal evidence was. One, they had a trader who said he had never heard of this course of dealing. But the trader, of course, is not the person who deals with the contracts. The contracted issue was signed by a Target vice president who was not called at trial, nor was anyone who dealt with actual contracting at Target called to offer testimony. Number two, Target said that its standard operating procedure was to allocate volumes of gas pro rata. In other words, if you're short 50 percent, then everybody gets 50 percent of their deliveries. But that doesn't the same party that have different pricing terms. So there was no rebuttal to all of the evidence that we presented, and the jury very well could. Counsel, one rebuttal is a legal one to Texas business, 2. something, 615. And it seems like some of it turns on plural versus singular use of words and allocating among different customers or allocating among one customer. Is that what statute turns on and why it's inapplicable here? Yeah, no, it's two things. First of all, it's clearly talking about volumes and quantities. So if you look at it, it says in section one of 2.615, delay in delivery or non-delivery in whole and part. So that's talking volumes. Then in two, it says when the clauses mentioned in subdivision one affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers. So it's clear this is talking about volumes. It's talking about the production, the amount of gas that there is available. And the cases that interpret this, whether it's Judge Lake in LNG Americas or the J House Power case, they're all talking about volumes. There's nothing in this that says when you have allocated your volume to a customer but that customer has multiple contracts with you, what you do vis-a-vis those two contracts. 2.615 just doesn't speak to that issue at all. All right. If I could talk a little bit about the jury instruction. We've talked about 6.15. We've talked about the trade custom in which, incidentally, Target got an instruction that they wanted in which the judge instructed the jury that to establish trade usage, there would have to be a dominant pattern of use. So what about the separate days instruction? They completely misconstrued the gas daily 17 thing. That's talking about nominations. It's not talking about pricing or anything else. Number two, it would be error to give an individual day instruction. First, the parties in this case agreed that there was a single question to be asked the jury. Is the pricing to be first of the month first or is it to be pro rata? And then that fed into a formula. If you look at the party's joint pretrial order, the parties agreed on what the damages would be depending upon that binary question. And so you wouldn't break it up by days. I have a quick question. Barrow shared its language that industry custom and usage cannot add a term to a contract, right? Is it as a term? Is was it term added? No. What? What? Burrow shaver is talking about it. There's a it says if there is an express term that's unambiguous, then you cannot add additional terms to contradict that in Burrow shaver that the it was a farm out agreement that says you can't assign it without written approval. And the parties said, well, but written approval really means only, you know, but written approval should not be unreasonably denied. And they claim that that was a trade practice. And the court said, look, it's an unambiguous term. We're not going to allow anything into to add to that. But but it's clear under two two oh two, including the comments to it, as well as the energy in case, going back to Fairfield Industries, Texas Court of Appeals case in 2017, State National Bank versus Woodfin in 1940, operator versus Nomo National Bank in 1923. All those things is a court when when a contract is silent on a term, you can most definitely and this is very specifically with two two oh two a says that's the situation, even if it's not ambiguous. Right? Yeah. If it doesn't address, I mean, if the contract is silent, if you have all the terms that make it a contract, but then there is a something missing that that is not explicitly there, then of course, two two oh two says you resort to trade usage to to fill in those missing terms. Time is up and you've saved time for rebuttal. Thank you very much, Your Honors. May it please the court. Russell Post here on behalf of Targa, along with my partners David Jones and Owen McGovern, I'll address the main appeal on the force majeure question. Mr. McGovern will address the cross appeal. Could I ask you a quick question about redacted under seal issues on pages three and twelve of the briefs? Is that some necessity of that being under seal in this this appeal? Your Honor, I believe that related to trade secrets information regarding the pricing of these contracts. That does need to be under seal? I believe it does need to be under seal. Now, in all candor, I would defer to the lawyers who are most familiar with the trial record, which is Mr. McGovern and opposing counsel, but I believe that it's properly sealed. We certainly don't contest that it was approved. Okay. Thank you. Of course. There's been extensive discussion this morning about the Court's Pioneer decision, and so I'll begin with Pioneer. Pioneer was a very closely watched case that attracted numerous amicus briefs because of its importance for the Texas oil and gas industry with respect to the NASB force majeure clause. Pioneer correctly resolved the questions regarding whether performance must be impossible to satisfy force majeure and the nature of the seller's gas supply does not include spot market gas. Counsel, one of the things that Pioneer opinion cited was your amicus brief along with Marathon in that case. Correct. Which talks about the organization, whatever those initials are, that came up with this form, and whatever to be made of that, the panel didn't really decide. Now that you're filing a party brief, you don't mention that. Do you not see the briefing that you did in that other case as amici as being particularly helpful here? On the contrary, Your Honor, we think that that briefing as adopted by the Pioneer panel becomes controlling. Adopted, referred to. How about that? I would disagree, Your Honor. I think that there's an alternative holding on the question of seller's gas supply. In the first instance, the Pioneer panel said seller's gas supply, because it's possessive, is limited to Pioneer's production. I want to talk about that issue as well in the context of Target. But the Court then goes on to say, even if one assumes that the term seller's gas supply is ambiguous, the history of the NASB force majeure clause demonstrates it doesn't require purchase of replacement gas. That's an alternative holding, which as the Court recognized, was founded on our amicus briefing. The reason we didn't fully brief that again is that it had been briefed in the context of Pioneer, which was ahead of our case in the pipeline, and we anticipated that that issue would be addressed as it was by Pioneer. You said not thoroughly. I don't want to belabor this point, but you don't mention it at all, do you, in this briefing? That aspect of the industry history of the NASB contract? The creation of this form contract. That's correct. The briefing does not refer to that at all. We didn't develop that in this brief. That's correct. I just want to question the fact. Absolutely. No, that's correct, Your Honor. And so let me take a step back then to talk about the first question of seller's gas supply, because I think that question is really the predicate to counsel's causation argument and also to the reasonable efforts argument that is developed in the briefs. Pioneer holds that in the first instance, that seller's gas supply is a possessive term, and it relates to the gas supply that was possessed in that instance by Pioneer. Just like Pioneer, Targa here has seller's gas supply, which is the output contracts in which it is obligated to take gas from its affiliates, and it had entered into one firm contract with one counterparty in anticipation of Winter Storm Urey. That was the only gas that, under the definition of seller's gas supply, was subject to Targa's possession. Why is it limited to that? Why does it include all gas reasonably available to Targa? For two reasons, Your Honor. The first reason is that Pioneer rejects the proposition that seller's gas supply means all gas that would be available in the spot market. It refers to gas that is owned or controlled by Targa, and that is only the gas for which Targa had firm contracts. Targa is not a middleman in the way that Mieko is, simply out in the market buying and selling gas positions. Targa has firm positions with its affiliates, and then it had acquired one other firm position. It does not have an obligation to purchase replacement gas, and that's the second answer to Your Honor's question, because Pioneer holds, and this is the alternative holding, founded on the Texas decisions and on the history of this force majeure clause, that even if the seller's gas supply were ambiguous, it doesn't include an obligation to purchase replacement gas in the spot market. And here's the distinction I want to draw for the Court. The fact that a party may enter into a contract prior to an event of force majeure that gives it ownership, a right to control gas, which makes it seller's gas supply, does not mean that that party has an obligation, when that supply fails, to go and purchase replacement gas. That is the proposition that Pioneer correctly rejects, and that is the proposition that's been rejected by every Texas decision since Taos Energy. You say Pioneer rejected it. Didn't it reject it when it's the seller's own producer, seller's own gas, and the rest of it's an open issue for us? Actually, I don't think so, Your Honor, because that holding— You need not to think that. Pardon, Your Honor? You need not to think that. No, Your Honor, I think not for two reasons. Number one, as I've said, Pioneer laid down a definition of seller's gas supply, which is not limited to producers. The definition is, what is the gas that is owned or controlled by the seller? Here, on the record of this case, the only gas owned or controlled by Target as the seller is those gas subject to the output contracts of the affiliates, and as the Court indicated, there's a special provision in this agreement that specifically refers to those affiliate contracts, and it is the other gas, that one contract for which Target had a firm obligation. That's the only gas that Target owned and controlled prior to Winter Storm Urey, but second— Does that just shift the necessity? It says Target can declare a force majeure in part if the affiliates declare a force majeure. Correct. You didn't get to whether the affiliates properly declared force majeure, correct? That's correct. That's not an inquiry under the clause, and there's never been any dispute that the affiliates did properly declare force majeure. That's not a contested issue in the case. Okay, but would you say it is a requirement of the contract? It is not a requirement of the contract. You would not concede that? I think all parties would agree it is not a requirement of the contract that the declaration of force majeure be, quote, proper. If the affiliates declare force majeure and terminate our gas supply, then Target has the right, likewise, to declare force majeure. Do you agree with your friend on the other side that there's absolutely no jurisdictional problem here? I do, Your Honor. I think that the partial summary judgment merged into the final judgment. I have no doubts about that question. Thank you. I want to follow up the point that I have just made about the seller's gas supply because it reaches directly into this question about what is required to exercise reasonable efforts. That's developed in the briefing. It's addressed by the pioneer opinion, and I want to make certain that our understanding of that issue is not lost on the court because, as I said at the beginning, the pioneer case correctly resolved the principal question of whether performance is impossible. It correctly resolved the question of the definition of seller's gas supply and rejected the proposition that seller's gas supply requires a purchase of gas on the spot market, but then the court stumbled by failing to apply that same reasoning to the reasonable efforts clause, and it held that the availability of gas in the spot market raises a fact issue under the reasonable efforts clause. That is squarely contrary to Texas law, and to be clear, pioneer is technically distinguishable since it was a New York law case, and whatever one might say about New York law, Texas law definitively resolves this question, and I want to call your attention to the decision I've alluded to it earlier, the Tejas Power decision from the Houston Court of Appeals in 1999, which explicitly held that an obligation of due diligence, a reasonable efforts obligation to overcome events of force majeure does not require purchase of gas in the spot market because it would render the force majeure clause meaningless, and the court held, and I quote, that interpretation would not be reasonable, and so under Texas law, reasonable efforts cannot require the obligation to purchase gas in the spot market, and I want to call... That argument, it seems to clash with the exception of force majeure, uh, that economic hardship cannot be the basis, so what is economic hardship referring to? Your Honor, economic hardship is referring to opportunism. It, the specific language refers to opportunities where a seller says, I could sell my gas for a premium, and therefore, I'll capitalize on that opportunity. Just give examples, but I don't know if that's a closed set. I think, Your Honor, though you have to recognize that every force majeure event, by definition, will impose some degree of economic hardship, so it proves too much to say simply because there was an economic impact, that means force majeure can't be invoked. If that were the answer, Pioneer would be wrong because there was obviously an economic hardship in Pioneer as well, and so that argument just proves too much. What I want to emphasize for the Court's benefit is that the Tejas power decision is the leading decision in Texas on this question, and... Is it a Supreme Court or an intermediate court? That is an intermediate court, and so I call your attention to this Court's decision in Herman Holdings v. Lucent Technology, which is at 302 Fed 3rd, 552, where this Court held, and I quote, in making an eerie guess, we defer to intermediate state appellate decisions unless convinced by other persuasive data that the highest court of the state would decide otherwise. No Texas case has ever disagreed with Tejas power. I key cited it myself last night to make sure I could verify that for you. This is the controlling rule. It was followed in the Virginia power case by the Texas courts. It was cited with approval by this case in Deinergy v. Ergon. It is the controlling case. It is binding for eerie purposes, and if the Court doesn't believe that it can recognize that Tejas power is binding, then I urge you to certify that question to the Texas Supreme Court. The industry in Texas needs certainty on this issue. We cannot have a rule in which there is a fact issue about the obligation to purchase replacement gas in the spot market that leads to a run on the bank, that forces every party in an event of force majeure to compete for limited gas that creates an inflationary spiral. That's the rationale that Texas courts have followed. That's the rationale that Judge Lake followed. That's the rationale that we believe the Texas court would unquestionably adopt, and so if you have any doubt about that question, we would invite you to certify it to the Texas Supreme Court. Mr. Post, is that in your brief? No, Your Honor. We had not argued for certification because we had not filed, Pioneer was decided after we filed our briefs. Had Pioneer been decided prior to our briefing, then we would have raised that issue, but I have been before the court many times where the court has asked me about certification of questions. Absolutely. Or the issue has arisen in the first instance. That's why I was surprised because it was pre-pregnancy. That's exactly right, Your Honor. Are there other cases in the pipeline, as it were, from Winter Storm, URI, I don't know, we named all the Winter Storms that regard us. What else may be pending and might pop up from either state court or this court? Your Honor, there are cases pending in the federal district courts that raise a variety of these issues, and some of those cases were alluded to in the amicus briefing in the Pioneer case. I don't know the precise status of those cases. I'm not aware of any case that is presently on its way to this court. I don't think there's any case here. I'm not aware of any here. That's correct, Your Honor. I see that my time . . . These related cases, none of them, the LNG and the unit petroleum, none of those are on appeal? I don't believe any of those are yet on appeal in front of this court. Okay. If we were to buy your argument that there's some sort of parallelism problem about the pro rata allocation not being treated the same as the force majeure, I'm confused why the district court, who's a very experienced district court, didn't send both issues to the jury and then deal with them on the back end. Why the district court didn't send both issues related to allocation to the jury? The allocation and the force majeure, if there is a fact issue, it seems that both would be very similarly done, and it is a short charge. Well, I think, Your Honor . . . It seems that if you think they're parallel, then you would send them both and you could deal with them on the back end on Rule 50 if you think there is a matter of law. It just seemed not . . . I think . . . Can you help me figure out what . . . I think I can, Your Honor. There are two potential parallel issues you might be contemplating. To the extent the court's contemplating a parallel issue embedded in the force majeure issue, it was quite clear to the district court that Texas law established no obligation to purchase replacement gas, so there was no factual issue to be decided. If that legal premise is true, their causation argument is unsound, their seller's gas argument is unsound, their reasonable efforts argument is unsound, that legal proposition disposes of the force majeure issue. If the parallelism relates to the allocation, it's a graceful opportunity for me to step aside and let Mr. Govern answer the hard questions. Thank you. Thank you, Your Honors. May it please the Court. My name is Owen McGovern and I represent Targa Gas Marketing LLC on the Cross-Appeal. Do you have any thoughts on that? Why the pro rata allocation issue wasn't sent to the . . . I mean, it was sent to the jury. I'm not quite sure I followed the premise of the question you asked, Mr. Post. It seemed like it could have been broken down for the jury either way. If you're not following, Mr. Post said that he was going to . . . So, your question is, why wasn't the force majeure issue submitted to the jury at the same time as the proper allocation issue? I think that the answer is because the force majeure issue was . . . Just so abundantly clear. Sorry? So abundantly clear that they didn't need to . . . Okay, that's fine. All right. So, I've limited time here, so I'd like to address two issues in the trial that I think were serious areas that require reversal. The first is that because Texas law forbids deploying trade usage as a new term to an integrated contract, and that was the only evidence that they had that we were in breach of the contract, the court improperly denied our J&OB and the court surrendered judgment. And the second issue is that the court committed two charge errors that misstated the applicable law. The first prohibited Targa from presenting its defense, its theory of the contract, and then it compounded that charge error by improperly instructing the jury on Mieko's theory of the contract. Both these issues were hotly contested factual issues, and the court erred by taking them away from the jury. So I'd like to start with Judge Elrod's question that he posed to co-counsel, which is whether there was a term added to this agreement, and there absolutely was. Under the Barrow-Shaver case that Judge Elrod referenced, the Supreme Court articulated the difference between a supplemental term and an additional term as follows. Trade usage is invoked, quote, to shed light on the meaning of the terms that are used, and that indefinite terms may be given meaning by trade usage. However, what the court was clear was that it would decline to allow industry custom to import an obligation that does not exist. So to put this simply, trade usage explains how the terms are used in the trade to make sure they have their proper specialized meaning to the parties used, but you cannot wholesale import new terms into the contract. And a good example of this is provided by the Texas Supreme Court in URI v. Kleberg. The citation for that is 543 Southwest 3rd 766, where the Texas Supreme Court said, if a contract says you will deliver to the green house, but it turns out there are two green houses on Pecan Street. What the trade usage says is you can use it to inform the green house means the second house on Pecan Street, not the first house. But what the Supreme Court said is that you cannot use trade usage to add additional terms that were not expressed in the agreement, such as you have to deliver by 5 o'clock or only on Sundays. So while you can supplement the term green house, you can't add additional terms like 5 p.m. and Sunday. And that is precisely what Mieko tried to do in the trial court. And you can tell this is what they tried to do because in their brief, they didn't have a single citation to the base contract, and they don't explain what term it is they're trying to supplement. They're not supplementing anything. They're trying to import wholesale a new obligation upon the parties, which is precisely what Texas law and UCC prohibit. And the importance of this, and they try to dispose of this pretense by kind of getting, playing on the factual or the apparent similarity between an additional term and a supplemental term. But the UCC speaks precisely to this issue. It's littered throughout UCC on this issue. 1.303, which they cite, says trade usage may give particular meaning to specific terms of the agreement. 2.202 says that the terms of a writing may be explained or supplemented. Even comment 2, which they rely on, says usage of trade is taken for granted when the agreement was phrased, and usage becomes an element of the meaning of the words used. So how does the contract specifically allocate partial deliveries of gas to fix contracts? The contract itself does not specifically allocate gas to fix contracts. What it does, there's two answers to this question. The first is the reason, I think I know what you're getting at. The reason what they're saying is inconsistent with the contract is because both contracts are defined as firm obligations. There is no daylight in the NASB contract between the two contracts. They're both firm obligations. They are identical. Where they find it, the reason it's inconsistent is they're saying two things. This is A, and this is A. They're both A, but then out of nowhere, they're saying, well, this A is better than this A. There's, that is in conflict at a minimum with what the contract says. But, So what should occur? What should occur, and under the UCC, what does occur is when you do not, when the contract doesn't speak to the allocation, and this is 2.615. 2.615 specifically tells us what to do, and it says where a force majeure affects only part of a seller's capacity to perform, they must allocate across customers, and in doing so, they may so, this is the important manner, which is fair and reasonable. So why, so they do not allocate to fixed price contracts first? They allocate in any manner that is fair and reasonable. That's what the UCC says. Why isn't that fair and reasonable if it's also the custom? Well, it's not the custom for the reason we were just discussing, but the question is But if it is the custom, I mean, did, did you rebut that that was not the custom? Well we did rebut the fact that it was not the custom of the industry. So contrary to what my friend said, the evidence is actually pretty clear that we rebutted that this was not the custom. If you look at, first of all, we rebutted it, and second of all, they have no evidence that we actually knew, which is the second element of custom and usage or trade usage under Texas law. So our evidence, so we'll start with our evidence. The testimony from our trader, Mr. Ruffing, was that he had never heard of this. My friend said that nobody in a position of contract authority, we have no evidence of that. That's not true. The vice president of NGL, uh, Branstetter, testified that pro rata is target's practice because, uh, both contracts, as I just explained, both contracts were firm and therefore had the same priority. We testified that all the evidence from our people is that we always do a pro rata, and our expert says, again, that the way the industry does it is pro rata, and then our expert said he's never heard of this FOM first deal. But then the jury decided to believe the other party's expert. Oh, right, which gets to the, well, so there's two points in that. One is that their evidence is legally insufficient because it doesn't satisfy the second prong. They have to show that we actually had knowledge of this trade, of this trade usage. Well, actually, it's a presumption, isn't it, and so you have to rebut it, and so they don't actually have to, there's no requirement that you should have to have that in the charge. There's no . . . Well, I disagree with that, Your Honor, because if it's a rebuttable presumption, right, so I just gave you the evidence that we rebutted it, so once a rebuttable presumption is rebutted under, under Texas law, under, um, I'm sorry, I don't have the case right here, under Horton, once it's rebutted, it disappears, and the burden shifts back to the party with the burden of proof. So when we offered evidence that we did not know about this trade usage, they then had to prove that we did know about it, and I don't think they proved that as a matter of law, but I'm running short on time. The important point is that that question wasn't in the jury charge. There was nothing in there that would allow the jury to decide whether we actually had knowledge or not. So, whether their evidence raises to a level that it creates a leak, that is legally sufficient to even create a fact issue on our knowledge, there was nothing in the charge that let the jury, uh, decide that question, and I know . . . Your Honor, I'm just . . . I'm sorry, we reversed the, the verdict saying that we were in breach of the contract and rendered judgment in our favor holding that we were not in breach of the contract, and the court, if that, if the court does that, they can render judgment in, in favor of Miyako in the amount of $2,000,000, $2,000,000, $2,069,795. That number can be found at ROA 3600-01. That's our first preference would be to render judgment in that amount. The, the other option would be to return this case to the trial court for a new trial with proper instructions that, first of all, allow us to put Section 2.615 in the jury charge, which is the standard for what we're required to do, and then, second of all, allows us to, uh, holds Miyako to their burden of proving their entire claim on trade usage, which requires showing that we had actual knowledge of the trade usage. Were you . . . you were able to argue this to the jury? I'm sorry, Your Honor? You were able to argue this. No, we were not able to argue this effectively to the jury, because 2.615 was not instructed. The question was, were we required to do it the way that they say that we were required to do it? And the, the instructions said you can consider trade usage, but what the instruction did not say is that we were entitled to allocate in any manner that is fair and reasonable, which goes to your earlier point, which is even if you view their evidence of trade usage as a fair and reasonable manner of allocation, it's not the only manner, or at least it's not decisively the only manner. But there's nothing that prohibited in jury interrogatory number one here that prohibits you from saying it's not regularity of observance, because it's not a dominant pattern of use within the industry, because we're a person, we're a player in the industry, and we don't do it that way. So you could argue that to the jury the same as you would with or without an instruction, that it, it's embedded into regularity of observance, isn't it? I disagree with you, Your Honor, because, because I think you're proceeding on the assumption that trade usage is the way to go here, and that, that's not correct. The standard rule is that we're entitled to man, to, uh, to allocate in any manner that is fair and reasonable, which could very well include trade usage, but it could also include other things. If any manner of fair, so here's an analogy, if any manner is, that is fair and reasonable is like the word sports, right? So any manner, any sport. They're saying we had to prove basketball, but sure, basketball might be a sport, but it's not any sport. We could, if we prove golf, or if we prove basketball, or football, we win. Right, and the instruction tells them that YACO has to prove it, and they have to prove it, that it's first month, to be delivered first of the month transaction fully before, that that's their burden to show that that's what was required, and that pro rata, it would be proportionately between the two transactions. Right. So they're told, the jury is told, that YACO would have to prove that that's the way, and you can say, no, that's not a reasonable way, and so, therefore, they haven't proven it. But that's exactly the point, is that, whether they prove trade secret or not, or trade use or not, has nothing to do with whether it is a reasonable way, or the only reasonable way. The question is whether, the question that was not submitted, is that we could prove it in any manner, any manner that is fair and reasonable. The fact that . . . But you could prove it in any manner. But the jury was never told that we . . . Did you argue that? If I go in, and I'm sorry, I haven't pulled the closing arguments. I should have. That's my mistake. Was it argued to the jury? Was what specifically argued to the jury? It could be in any manner that was fair and reasonable, or did you feel, or did someone object, and you felt hammered from making this argument? So we requested the instruction of fair and reasonable. It was denied. We used it in opening. We used it in our evidence. We had testimony on it. We objected in our Rule 50A motion to the lack of, to no evidence of fair and reasonable, and we objected at the charge conference to not getting this instruction. This was . . . What did you argue in your closing? What we argued in the closing is that, is that they had not proven their trade usage, first of all. Did you argue fair and reasonable to the jury as part of that? Did you bootstrap fair and . . . Yes. If I go in and look at the closing . . . Yes, yes. We did argue that this was not the proper, that their way was not the proper way of doing it, and the pro rata was the way it should be done. What we didn't have was any textual hook in the charge that presented our theory saying, this is what we're permitted to do. The question was pro rata, sort of floating by itself, or trade usage with an instruction saying, trade usage is okay, but nothing saying, tying the pro rata into what it was that they were allowed to decide. Okay. Thank you. Thank you, Your Honor. I've got a lot of ground to cover. The first thing is on the 11.2 question, which we didn't get to in my earlier argument, that Pioneer is very clear that it is a fact issue under 11.2 of the NASB, whether a party, even if force majeure is deemed to exist, has undertaken reasonable efforts to avoid the impacts of the force majeure. Tejas is . . . well, first of all, it's, you know, in this circuit, Pioneer is controlling. There's no difference on this issue between New York law and Texas law. It's a nationwide contract, and New York law didn't supply any different . . . Should we certify this to the Supreme Court of Texas? I'm sorry? Should we certify the issue to the Supreme Court of Texas? I don't think that's necessary, Your Honor, for two reasons. One, I think that Pioneer makes clear what the rule is, and number two, Tejas is talking about something completely different, and Tejas overlooks the difference between 11.1 and 11.2. In Tejas' power, the court was concerned that it would just be reading force majeure out if the availability of gas meant that there was impossibility, and Pioneer covers that and says, well, you know, the standard is an impossibility, and Tejas goes on and says, well, we're concerned that there would never be a case in which you could declare force majeure if you have to undertake reasonable efforts to ameliorate it. That's simply not true. One is, do you have force majeure? Then there's a question, are there reasonable efforts? The availability of gas at the delivery location is going to be a pertinent point. The availability of gas, and this was the Ergon Dynagy concern in footnote five, was you can't point to gas that's in Kazakhstan and say, well, there was some gas available there. You have to show that it was reasonable, available, purchasable, otherwise you're reading 11.2 out of the contract, so it's not duplicative. Furthermore, the court never addressed the economic hardship issue, which is precisely the issue that we have here, as Judge Higginbotham pointed out. So let's talk a little bit, then, about the custom and practice. It simply is not the case that you cannot supplement the terms of a contract with additional, with evidence of trade usage. That's the whole point of 2202. It, you know, Council only reads the explained part of it, but it says it can be explained or supplemented, and what are you doing if you're providing those terms other than supplementing it? And the commentary makes it clear that the reason you have trade usage is it's to be read on the assumption, and I'm quoting now, that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased, unless carefully negated, they have become an element of the meaning of the words used. So it's clear that here, where it's silent on the situation where you have two different price contracts, what do you do? That is exactly when you would use evidence of trade usage, and in fact, Section 1303, which defines trade usage, talks exactly why that there would be an expectation that the parties would contract with that as part of the contract. Otherwise, you're completely reading out 1303 and 202 to say, oh, it can only further define existing terms, and in fact, Burroughs-Shaver says the opposite. Can we talk about the jury charge? Sure. They perfectly preserved the issue, didn't they? Which? The 615 issue? The issue about the trade. They preserved it by the knowledge issue. I would have to go back and look. I believe that they did. I mean, it's like textbook where the court refused the instruction. It's textbook preservation. Why wasn't it an error to not have the other part of the instruction? Because knowledge is not a requirement. That is clear. If you take a look at the Energin case, that knowledge is not required. It's not an element, and in fact, Targa points to a footnote in which the Energin court cites the cases that Targa cites and says, look, that doesn't make any sense to say that there would have to be knowledge. I mean, the whole point, as we just talked about in 2202 and in 1303, is that the parties are assumed to have contracted with it. There is no separate obligation to say that a party has to show that it specifically knew about it. It has to disclaim that, but the presumption, and that's the whole element of a presumption, is that the presumption is that the parties contracted with reference to that trade usage. And so the district court was absolutely correct in not giving that instruction. If it were to give that instruction, it would be error because it would suggest that the parties absolutely would have to affirm in every case, in which case you would have a party just as it did here. You have a lower . . . Do you disagree that there is evidence in the record that they did not use that, that was not the custom of that company on prior occasions? I do disagree, Your Honor. They're conflating two things. The testimony was when it comes to allocating short volumes, that their practice was to allocate on a pro rata basis. There was zero testimony at all as to any TARGA practice when it came to two contracts with the same counterparty with different pricing terms. There was absolutely zero evidence presented by TARGA that would show that there was any kind of contrary dealing. The only thing that they presented was the evidence of the trader who had nothing to do who said he wasn't aware of how those worked. But the testimony that was given only pertained to volumes. There was zero testimony that was provided by TARGA that addressed at all the course of usage in the industry as it pertained to two contracts, one first of the month or fixed price and the other being gas daily. Thank you. We have your argument. We appreciate all the arguments in the case today that have been very helpful. Thank you, Your Honors.